John THOMSON, Plaintiff,

v.

Lieutenant Earl JONES, et al., Defendants.

No. 81 C 1279.

United States District Court, N.D. Illinois, E.D.

Oct. 4, 1985.

Sara Johnson, Schiff Hardin & Waite, Chicago, Ill., for plaintiff.

Thomas A. Ioppolo, Asst. Atty. Gen., Chicago, Ill., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SHADUR, District Judge.

John Thomson ("Thomson") has sued Stateville Correctional Center ("Stateville") Lieutenant Earl Jones ("Jones"), Correctional Officer Marvin Baskin ("Baskin"), Sergeant William Sheldon ("Sheldon") and

Warden Richard DeRobertis ("DeRobertis") under 42 U.S.C. § 1983 ("Section 1983"), asserting various violations of Thomson's constitutional rights while Thomson was in custody at Stateville. After a bench trial the parties have supplemented their extensive pretrial submissions by tendering proposed post-trial findings of fact and conclusions of law.

In accordance with Fed.R.Civ.P. ("Rule") 52(a), this Court finds the facts specially as set forth in the following Findings of Fact ("Findings") and states the following Conclusions of Law ("Conclusions"). To the extent if any the Findings as stated reflect legal conclusions, they shall be deemed Conclusions; to the extent if any the Conclusions as stated reflect factual findings, they shall be deemed Findings.

*Findings of Fact*

*I. Stipulated Facts and Related Background*

1. From April or May 1980 through June 2, 1982 Thomson was an inmate at Stateville in Joliet, Illinois. Since that time Thomson has been an inmate at Pontiac Correctional Center ("Pontiac").

2. DeRobertis was Acting Warden at Stateville from July 1980 through March 26, 1981. On March 26, 1981 DeRobertis became Warden at Stateville, and he served in that capacity until November 19, 1983.

3. Since some time before January 22, 1981 Baskin has been, and he still is, a guard at Stateville. Baskin was on a medical leave of absence from Stateville between October 13, 1981 and November 1982 because of an automobile accident.

4. For some time before January 22, 1981 Jones was a guard at Stateville. Jones continued as a guard at Stateville until he resigned September 30, 1981.

5. For some time before January 22, 1981 Sheldon was a guard at Stateville. Sheldon continued as a guard at Stateville until June 8, 1981.

6. Security personnel at Stateville range upward from Correctional Officer or guard (the lowest level) successively through the ranks of Sergeant, Lieutenant, Captain, Major, Unit Superintendent, Assistant Warden for Programs and Operations, and Warden.

7. For some time before January 22, 1981 Thomson resided in Stateville Cell House B–West. He was a maintenance ("cellhouse help") worker in B–West until that date. At that time Jones told Thomson he was fired from that job and charged Thomson in a resident disciplinary report ("ticket"), which was later dismissed by the Adjustment Committee (PX 10–11). Thomson was returned to cellhouse help work status January 24, the day before the episode that is the main focus of this action and is described in later Findings.

8. Thomson was seen by medical personnel at Stateville on January 25 and 26 and February 5, 1981 (after the January 25 episode to be described later).

9. Illinois Department of Corrections ("Department") Administrative Regulation ("A.R.") 410 both (a) forbids prison personnel from using unnecessary force against an inmate and (b) provides that employees who improperly use force against an inmate shall be subjected to immediate disciplinary action. A.R. 803 forbids prison personnel from administering corporal punishment to an inmate. Both those A.R.s are designed for the protection of inmates.

10. A.R. 804 forbids inmates from violating institutional rules.

11. DeRobertis never discussed Thomson, his lawsuit or the facts alleged in Thomson's Complaint in this action with Jones, Baskin or Sheldon.

12. On October 19, 1981 Department's Internal Investigations Department concluded Jones and Baskin had used excessive force toward Thomson on at least two separate occasions on January 25, 1981.

13. No disciplinary action was instituted against Jones as a result of his use of excessive force against Thomson. No disciplinary action was imposed on Baskin for

his use of excessive force against Thomson or on Sheldon for his alleged harassment of Thomson.

14. All tickets prepared on January 25, 1981 by Stateville employees as to Thomson were either dismissed or expunged.

15. Stateville's policy requires that all correctional officers be formally reviewed annually.

## II. Thomson's Behavior and His Credibility

16. Thomson received 57 tickets (exclusive of the tickets referred to in Finding 14) between August 1980 and February 1983, for violations of various rules stated in A.R. 804. Except for the November 20, 1981 ticket referred to below (see DX 98 and 99), Thomson was found guilty by the institutional Adjustment Committee of each of the following charges:

| DATE OF REPORT | REPORTING OFFICER | CHARGE |
|---|---|---|
| 1. August 14, 1980 (DX 12, 13) | Off. Holt | cursing an officer |
| 2. October 16, 1980 (DX 14, 15) | Off. Choate | hitting another resident in the eye |
| 3. January 12, 1981 (DX 16, 17) (1:30 p.m.) | Off. Holt | disrespect to staff and disobeying an order |
| 4. January 12, 1981 (DX 18, 19) (7:36 p.m.) | Off. Rosen | disobeying an order |
| 5. February 23, 1981 (DX 20, 21) | Off. Thomas | refusal of transfer to Cellhouse C |
| 6. February 26, 1981 (DX 22, 23) | Off. Sheldon | refusal of transfer to Cellhouse C |
| 7. March 4, 1981 (DX 24, 25) | Off. Sheldon | refusal of transfer to Cellhouse C |
| 8. March 7, 1981 (DX 26, 27) | Off. Rabideau | refusal of authorized transfer |
| 9. March 8, 1981 (DX 28, 29) (7:05 p.m.) | Off. DeMeulemeister | refusal to be locked up |
| 10. March 8, 1981 (DX 30, 31, 32, 33) (7:55 p.m.) two reports | Off. DeMeulemeister Off. Sweet | running away from officer in the cellhouse |
| 11. March 9, 1981 (DX 34, 35) | Off. Bush | running between emergency room and hospital gate |
| 12. March 27, 1981 (DX 36, 37) | Off. Comp | eating in the dining room at an unauthorized time, failing to lock up |
| 13. April 1, 1981 (DX 38, 39) | Off. Sheldon | refusal of transfer to Cellhouse C |
| 14. April 4, 1981 (DX 40, 41) | Off. Sheldon | refusal of transfer to Cellhouse C |
| 15. April 5, 1981 (DX 42, 43) | Off. Bak | cursing, exposing his penis to correctional officer |
| 16. April 12, 1981 (DX 44, 45, 46, 47) | Off. Farmer Off. Keefe | cursing, running on gallery |

| DATE OF REPORT | REPORTING OFFICER | CHARGE |
|---|---|---|
| 17. April 12, 1981 (DX 48, 49) (8:45 p.m.) | Off. Keefe | cursing |
| 18. April 19, 1981 (DX 50, 51) | Off. Carter | kicking officer in left knee when being shaken down |
| 19. May 20, 1981 (DX 52, 53) | Lt. Tazelaar | cursing at the Lieutenant |
| 20. May 22, 1981 (DX 54, 55, 56) | Off. Sheldon | cursing at the officer, breaking a light, spraying glass over the cellhouse, swinging light fixture in a threatening manner |
| 21. September 9, 1981 (DX 57, 58) | Off. Manning | cursing at correctional officer |
| 22. September 13, 1981 (DX 59, 60, 61) | Off. Langlois | throwing food at officers |
| 23. September 14, 1981 (DX 62, 63) (6:45 p.m.) | Joretta Ibarra-Lim | throwing hot water on staff |
| 24. September 14, 1981 (DX 64, 65) (9:00 a.m.) | T. Peterson | throwing hot water on med. tech. |
| 25. September 18, 1981 (DX 66, 67, 68) | Off. Keefe | possession of contraband |
| 26. October 7, 1981 (DX 69, 70) | Off. Wilson | theft, insolence, disobeying a direct order |
| 27. October 27, 1981 (DX 71, 72) | Off. Evans | throwing a bucket of water on an officer |
| 28. October 27, 1981 (DX 73, 74) (9:30 p.m.) | Off. Lender | possession of contraband |
| 29. October 27, 1981 (DX 75, 76) (9:35 p.m.) | Lt. Davis | throwing objects at officers |
| 30. October 27, 1981 (DX 77, 78) (10:50 p.m.) | Off. Evans | throwing a bucket of water on officer |
| 31. October 27, 1981 (DX 79, 80, 81, 82) (11:50 p.m.) | Off. Bak Off. Howell (2 reports) | throwing liquid substance on officer |
| 32. November 3, 1981 (DX 83, 84) | Off. Muhammad | threatening to stab an officer |
| 33. November 4, 1981 (DX 85, 86, 87) | Off. Craddock | damage to property |
| 34. November 13, 1981 (DX 88, 89) | Off. Jordan | hitting an officer with milk carton |
| 35. November 17, 1981 (DX 90, 91) | Georgia Dockery | theft |
| 36. November 18, 1981 (DX 92, 93) | Off. Wilson | disobeying a direct order |
| 37. November 19, 1981 (DX 94, 95) (12:30 p.m.) | Off. Wicks | disobeying a direct order |

| DATE OF REPORT | REPORTING OFFICER | CHARGE |
|---|---|---|
| 38. November 19, 1981 (DX 96, 97) (1:45 p.m.) | Off. Simpson | threats, disobeying an order |
| 39. November 20, 1981 (DX 98, 99) (Thomson found not guilty) | Off. Gibson | threatening to kill correctional officer |
| 40. November 21, 1981 (DX 100, 101) | Off. Craddock | throwing liquid substance on officer |
| 41. December 2, 1981 (DX 102, 103) | Off. Farmer | intimidation, insolence, threats |
| 42. December 4, 1981 (DX 104, 105, 106, 107) | Off. Jordan Off. Farmer | throwing hot water on officers |
| 43. December 9, 1981 (DX 108, 109) | Judy Pedersen | cursing at staff |
| 44. December 20, 1981 (DX 110, 111) | Off. Satterlee | unauthorized movement, threatening employee |
| 45. January 13, 1982 (DX 112, 113, 114, 115) | Off. Raines | intimidation, threats, locking up on the yard |
| 46. January 13, 1982 (DX 112, 113, 114, 115) | Sgt. Newton | assaulting an officer |
| 47. January 16, 1982 (DX 116, 117) | Off. Robertson | throwing hot water at officer |
| 48. May 22, 1982 (DX 118, 119) | Off. Farmer | damage or misuse of property |
| 49. December 9, 1982 (DX 120, 121, 122) | Off. Bernardoni (Pontiac) | disobeying a direct order |
| 50. December 30, 1982 (DX 123, 124) | Off. Stark (Pontiac) | possession of unauthorized medications |
| 51. January 21, 1983 (DX 125, 126) | Off. Bulzak (Pontiac) | assaulting correctional officer |
| 52. February 1, 1983 (DX 127, 128) | Off. Bulzak (Pontiac) | possession of unauthorized property |
| 53. February 15, 1983 (DX 129, 130) | Off. Sutherland (Pontiac) | refusal to give up security belt and cuffs |
| 54. February 15, 1983 (DX 131, 132) | Off. Roper (Pontiac) | refusal to be cuffed and leave segregation yard |
| 55. February 16, 1983 (DX 133, 134) | Off. Dailey (Pontiac) | disobeying a direct order |
| 56. February 22, 1983 (DX 135, 136) | Off. Elzey (Pontiac) | refusal to give up his handcuffs |
| 57. February 23, 1983 (DX 137, 138) | Off. Ruhlander (Pontiac) | disobeying a direct order |

17. On January 22, 1981 Thomson was seen by medical personnel at Stateville. At that time Thomson said "he was dragged down gallery saying he could walk." In addition the doctor's note stated (DX 170 at 1–2):

Inmate says he's engaged in passive resistance. Says he's not yet injured except minor abrasions both wrists. Says

he anticipated being beaten and now wants his ... (illegible) condition recorded.

Thomson's self-announced policy of "passive resistance" and its implementation (by active as well as passive resistance), and *not* the January 25, 1981 incident or any conduct of any defendant, were the cause for the escalation of disciplinary incidents involving Thomson after January 25 (as reflected in Finding 16).

18. Thomson has been a substantial disciplinary problem at both Stateville and Pontiac. As evidenced by Finding 17, Thomson's rebelliousness antedated the January 25, 1981 incident. Though inmate provocation does not of course justify or excuse misconduct (most particularly physical abuse) by correctional officers, it is clear (a) Thomson's post-January 25, 1981 rule violations are not the result of the incident on that date and (b) no defendant, including DeRobertis, caused Thomson's continuously disruptive and assaultive behavior.

19. Thomson's denial that he spat water at Jones during the January 25 incident (a denial this Court specifically discredits) exemplifies his unwillingness to accept responsibility for his own conduct.[1] Thomson's limited pre-January 25 conduct and extensive post-January 25 conduct as a troublemaker are matters for which he must accept responsibility. Thomson was neither singled out as a troublemaker nor harassed by any defendant because of the January 25 incident or because he filed this action.

20. Thomson's exaggerations of certain aspects of his injuries, his refusal to acknowledge responsibility for his own conduct and his clearly unbelievable testimony as to DeRobertis, coupled with his plain hostility toward correctional staff and administrators, have caused this Court to conclude he is not a credible witness in those and a number of other respects.

### III. January 25, 1981 Incident

21. Excessive physical force was used against Thomson by Jones and Baskin January 25, 1981 (PX 70). At that time Thomson was about 5'8" tall and weighed about 125 pounds, while Jones was at least 6' tall and weighed 40–50 pounds more than Thomson, and Baskin was about 6' tall and well over 200 pounds.

22. On the night of January 24 Jones had said Thomson had to have his property packed up to change cells the following morning. Early in the morning of January 25 Jones appeared and dragged Thomson (who had not yet packed his property) out of his bunk (Tr. 38). Baskin and Thomson's cellmate Joseph Sims ("Sims") were present at the time (Tr. 39). After Thomson packed his personal items, Jones told Thomson he had to choose whether to go to the segregation unit or the protective custody unit. Thomson refused to make a choice, and Jones ordered him to go up to 9 Gallery (the protective custody area) (Tr. 40–41).

23. Though Thomson went up to 9 Gallery, he refused the protective custody cell assignment there (Tr. 42) and went back down to 1 Gallery, where he continued to dispute the proposed alternative cell assignments with Jones (Tr. 43).

24. Jones then told Baskin to find Thomson a cell in the segregation unit and to take him there (Tr. 44). Baskin handcuffed Thomson behind his back and pulled him toward the staircase by the chain between the handcuffs. Though Thomson claims Baskin then kicked his legs out from under him without provocation (Tr. 44), it is more likely the incident was provoked by Thomson's going limp as another manifestation of his premeditated passive resistance (see Finding 17). Nonetheless Baskin

---

1. This Finding should not be misunderstood as a determination that Thomson was at fault in doing so—for his retaliatory reaction to the unjustified physical beating to which he was being subjected is certainly understandable (if not justifiable). Thomson's denial is rather a reflection on his lack of credibility, which has led to the rejection of substantial parts of his testimony.

was wholly unjustified in his conduct described in Findings 25 and 26.

25. In any event, Baskin then dragged Thomson to the stairway. Baskin continued to drag Thomson by the handcuffs behind his back all the way up the flight of stairs to 3 Gallery (Tr. 45–46), then around the corner and up the flight of stairs from 3 Gallery to 5 Gallery (Tr. 46–47), then around that landing and up the next flight of stairs from 5 Gallery to 7 Gallery. All during that time the handcuffs were digging into Thomson's wrists (Tr. 47–48). Even though the episode was more likely triggered by Thomson's conduct (see Finding 24), rather than representing unprovoked and gratuitous violence (as Thomson would have it), Baskin clearly engaged in excessive force in his own conduct described in this Finding.

26. Baskin then dragged Thomson backwards down 7 Gallery (Tr. 48) and put him in a cell. At trial Thomson claimed the cell was completely flooded and otherwise uninhabitable (allegedly the toilet didn't work, there was no light, the light fixture was ripped out and the bed was destroyed) (Tr. 49), while Baskin claimed it was Thomson who was flooding and destroying the cell interior. In any case, after Thomson began to bang on a metal cabinet in the cell to attract attention (*id.*), Baskin reappeared at the cell, took Thomson out, handcuffed him again behind the back and dragged Thomson down the 7 Gallery.

27. At that time Jones appeared on 7 Gallery, and Thomson was placed in another cell on 7 Gallery (Tr. 50–51) already occupied by Charles Lewis ("Lewis") (Tr. 51, 53). Thomson went to the *back* of the cell and drank some water (he was still handcuffed behind the back, but he could press a button so that the water would run) (Tr. 51). Then he spat out the water onto Jones' shirt at the *front* of the cell (this Court discredits Thomson's wholly improbable testimony that it was Jones' punching Thomson in the side that caused Thomson to regurgitate onto Jones' shirt the water Thomson had just drunk some 15 feet away) (Tr. 51).

28. Jones then ordered Baskin to remove Lewis from the cell. Jones punched Thomson, pushing him against the wall and punching him in the ear among other places. Jones yelled at Thomson, "I should kill you, I should kill you," and continued to strike, kick and choke Thomson (who, because he was handcuffed behind his back the entire time, could not defend himself) (Tr. 51–53). Jones then dragged Thomson down the 7 Gallery by the handcuffs and banged Thomson's head against a metal food cart once or twice (Tr. 54).

29. Throughout Jones' physical abuse of Thomson, Baskin took no steps (a) to restrain Jones, (b) to persuade him to stop or (c) to assist Thomson. Thomson testified Baskin stood near the front of the cell laughing (Tr. 52), and this Court credits that testimony.

30. Jones then manhandled Thomson all the way down to 1 Gallery, dragged him down that Gallery and threw him into an isolation cell against the back wall. That cell was completely screened off with metal, had no light inside and was extremely dirty (Tr. 55–56). Jones told the officers on the gallery that if any residents went near Thomson or gave him anything, they were to be locked in their cells and fired from cellhouse help (Tr. 402).

31. Neither Sheldon nor DeRobertis was present in Unit B-West during the January 25 episode, and neither took any part personally in any use of force against Thomson.

32. More than 24 hours elapsed before Thomson was taken to the Stateville hospital by two officers. Thomson was examined by Dr. Hutchison, who noted the presence of multiple superficial abrasions, probable soft tissue injury to the left ear and possible injury to the left auditory nerve (PX 73). Thomson did not, as he testified, suffer black eyes or extensive bruises all over his body. Thomson did however continue to experience ringing in his left ear and inability to hear for several months (Tr. 59, DX 170, 155 at 1). As a result of the beating Thomson has suffered a moderate to severe loss of hearing in his left ear,

which persisted at least through the time of Thomson's most recent independent examination in June 1983 and which this Court accordingly credits as permanent (Tr. 56–57, 201, PX 68).[2]

*IV. Sheldon's Liability*

33. There is no credible evidence that Thomson was verbally or physically harassed by Sheldon after January 25, 1981. In any event Sheldon remained a guard at Stateville less than 90 days after Thomson filed this action.

34. Thomson received several valid tickets prepared by Sheldon after January 25, 1981. None of those reflected harassment for Thomson's institution or prosecution of this action.

35. On six recorded occasions after January 25, 1981 (DX 20, 22, 24, 26, 38, 40), four at Sheldon's instance, Thomson had and refused the opportunity to be transferred to another cellhouse at Stateville. That sequence of events is inconsistent with Thomson's present claim of harassment.

36. This Court does not credit Thomson's testimony as to Sheldon's express or implied threats or physical misconduct (pushing Thomson and squeezing Thomson's handcuffs tightly) after Thomson filed this action pro se. Thomson demonstrated his lack of credibility in part by ascribing to DeRobertis, when Thomson assertedly complained to him of the tight handcuffing, the response "Good, you need it" (Tr. 96–97). That testimony is wholly incredible.

37. Thomson did not assert any alleged misconduct by Sheldon in the post-incident administrative investigation at Stateville, a fact that also undercuts Thomson's present claims of such misconduct.

*V. DeRobertis' Liability*

38. Much of Thomson's attack against DeRobertis focuses on DeRobertis' post-January 25 conduct: claimed failure to investigate the incident, claimed failure to discipline the involved officers, and so on. Those claims are not supported by the evidence and are discredited by this Court. It is unnecessary however to deal with them by detailed findings (as both parties have tendered), for such post-event conduct is irrelevant to the only possible basis for liability against DeRobertis: alleged failure to train, supervise and control Jones or Baskin *before* the incident. No post-incident conduct by DeRobertis caused any harm to Thomson.

39. Neither Jones nor Baskin was disciplined for any conduct involving excessive use of physical force against inmates before January 25, 1981. Nor did any prior disciplinary history of Jones or Baskin demonstrate conduct that would reasonably have placed DeRobertis on notice of any risks to inmates posed by those officers so as to obligate him personally to require discipline or further training:

(a) On March 26, 1980 Jones was involved in an altercation with inmate Angelo Caldwell at Stateville (DX 157).

(b) On May 10, 1980 Baskin was involved in an altercation with inmate Dickie Gaines at Stateville (DX 166).

(c) Neither the Jones-Caldwell incident nor the Baskin-Gaines incident involved such a clear-cut situation of grievous fault nor such an excessive use of force that the head of Stateville's large administrative staff (DeRobertis) could be charged with personal responsibility for any failure to discipline the officer or to require further training.

(d) Other disciplinary actions taken against Jones and Baskin before January 25, 1981 concerned other rule violations,

---

**2.** This Court rejects defendants' efforts to characterize Thomson's hearing loss as feigned (the audiologist, who had no stake in the matter at all, testified it would require real sophistication on Thomson's part to fake the progressive loss-of-hearing readings shown by the audiometer test) or perhaps due to "a preexisting congenital abnormality or excessive wax in the ear." That sort of argument tends to discredit defendants' other more tenable contentions, so at the least it reflects poor litigation strategy (if not indeed an absence of bona fides on the part of defense counsel).

such as absenteeism or tardiness, not relevant to the use of excessive physical force.

40. There is no credible evidence that the failure to discipline Jones in the Caldwell incident or the failure to discipline Baskin in the Gaines incident encouraged their misconduct against Thomson or was otherwise a proximate cause of the injury to Thomson on January 25, 1981. In any event, the reasonable delegation of investigation and disciplinary responsibility at Stateville is such that no collateral consequences of any failure to impose discipline for such comparatively minor incidents can be ascribed to DeRobertis individually.

41. There was no widespread, systemic failure to discipline employees at Stateville during DeRobertis' tenure as Warden. No failure by DeRobertis to discipline Jones, Baskin or any other employee was a proximate cause of injury to Thomson.

42. Stateville is a maximum security prison (Tr. 482) with an inmate population of approximately 2,250 men (Tr. 477). It has approximately 1,000 staff personnel, of whom 550 are uniformed correctional officers working in the area of security (*id.*).

43. DeRobertis as Warden was the chief administrative officer at Stateville. Reporting to him were two Assistant Wardens, one for Program Services, the other for Operations (Tr. 478). Immediately below them in the organizational hierarchy were the Unit Superintendents of the various cellhouses and the Major, who is the chief of security and the highest ranking of the uniformed security staff. In descending order from the Major were the ranks of Captain, Lieutenant, Sergeant and Correctional Officer (Tr. 481–82).

44. In January 1981 Eugene Venegone ("Venegone") was the Superintendent of B-West, which had a staff of Sergeants, Lieutenants and a Captain to supervise Correctional Officers. Those officers also supervised inmates, provided them services and provided security in the unit. On frequent occasions B-West would be visited by one or more of the Wardens (Tr. 536–42).

45. During January 1981 (as at all other times) Venegone would meet regularly with his staff, including the supervising correctional officers and casework supervisor. He would also meet regularly with his own supervisor, the Assistant Warden of Operations, as to the day-to-day activities in B-West (Tr. 543).

46. There was no systemic or widespread failure to supervise correctional officers in B-West during DeRobertis' tenure as Warden. No failure of supervision by DeRobertis was a proximate cause of injury to Thomson.

47. Jones and Baskin completed pre-service training as correctional officers in 1979 (Jones in July and Baskin in November) (DX 1 and 2). At that time Department had a training Academy whose function it was to train new correctional officers, one of the first such institutions among state correctional systems (Phillips Dep. 23). Pre-service training comprised three weeks at the Academy and three weeks of on-the-job training at the institution (DX 144 at 1). One of the subjects covered in training new officers is the proper use of physical force (Phillips Dep. 29–30, DX 144).

48. DeRobertis had no personal involvement in the training of Jones or Baskin (Tr. 496), nor did he know of any need on their part for further training in the proper use of physical force.

49. There was no systemic or widespread failure to train or retrain Baskin or Jones. No failure of training by DeRobertis was a proximate cause of injury to Thomson.

50. In sum, DeRobertis did not preside over or permit any systemic breakdown in institutional procedures during his tenure at Stateville. Although this Court does not subscribe to all the implications of DeRobertis' testimony in terms of delegation of responsibility as a total insulation against potential personal liability on the Warden's part, it is clear that the Warden of a large maximum security prison such as Stateville

cannot reasonably be expected to take part personally in every internal investigation and that he must delegate those investigative duties to others. That delegation in this case was reasonable and was not a proximate cause of injury to Thomson.

## VI. *Thomson's Damages*

51. Taking into account Thomson's hearing loss (the most serious as well as the only permanent effect of Jones' beating of Thomson, who was 26 years old at the time of the hearing) as well as the pain and suffering and lesser physical injuries consequent upon the misconduct of both Baskin and Jones, Thomson is entitled to compensatory damages of $25,000. Because of Baskin's own direct physical abuse of Thomson and his active acquiescence in (without any effort to restrain) Jones' beating of Thomson, Baskin and Jones are jointly and severally liable for those damages.

52. Thomson is also entitled to an award of punitive damages against each of Jones and Baskin to punish them for their respective acts of brutality, which were imposed on Thomson wilfully and with malice, and to deter like conduct by other correctional officials. Because Jones' actions were substantially more egregious and more wantonly inflicted, $10,000 is awarded against Jones and $5,000 against Baskin.

### *Conclusions of Law*

1. This Court has jurisdiction over the parties and the subject matter of this action under 42 U.S.C. § 1983 and 28 U.S.C.

---

**3.** As a matter of simplicity rather than precision, these Conclusions will refer to the underlying Bill of Rights provision rather than to the directly applicable Fourteenth Amendment.

**4.** It goes without saying Thomson is not interested in getting "due process"—notice and a hearing—before he is beaten by correctional officers. He does not want to be beaten at all. In analytical terms, then, his right is to "substantive due process," not to process alone. But

---

1343(a)(3). Venue is properly in this district under 28 U.S.C. § 1391(b).

■ 2. One prohibition imposed by the Eighth Amendment, made applicable to the States via the Fourteenth Amendment,[3] is against "the wanton and unnecessary infliction of pain" on prison inmates. *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981); and see *Ingraham v. Wright*, 430 U.S. 651, 666–67, 97 S.Ct. 1401, 1409–10, 51 L.Ed.2d 711 (1977). As Findings 21–30 reflect, both Jones and Baskin used excessive physical force against Thomson and thus violated his Eighth Amendment rights.

■ 3. Even apart from the Eighth Amendment's guaranties, one of the "historic liberties" protected by the Fourteenth Amendment itself is the "right to be free from, and to obtain judicial relief for, unjustified intrusions on personal security." *Ingraham*, 430 U.S. at 673, 97 S.Ct. at 1413. And at a minimum that "encompass[es] freedom from bodily restraint and punishment." *Id.* at 673–74, 97 S.Ct. at 1413–14. Prison inmates are one class of individuals as to whom the State has a "constitutionally recognized 'affirmative duty' to provide certain 'elementary protective services.'" *Benson v. Cady*, 761 F.2d 335, 339 (7th Cir.1985), quoting *Jackson v. Byrne*, 738 F.2d 1443, 1446 (7th Cir.1984). Again at a minimum, that protection must embrace the freedom from beatings by prison personnel. Jones and Baskin thus also violated Thomson's right not to be deprived of liberty without due process of law—his direct Fourteenth Amendment right.[4]

---

until the law changes to embrace such approaches to the Due Process Clause as that urged by Judge Easterbrook's concurring opinion in *Gumz v. Morrissette*, 772 F.2d 1395, 1404–09 (7th Cir.1985) (asserting only the Fourth Amendment, not the Fourteenth, applies to excessive force in an arrest situation), the conclusion reached in the text here remains valid.

■ 4. Prisoners possess a constitutional right of access to the courts (though no court has specifically identified what constitutional provision is implicated). *Bounds v. Smith,* 430 U.S. 817, 821–25, 97 S.Ct. 1491, 1494–96, 52 L.Ed.2d 72 (1977). Threats of physical harm impermissibly restrict that right. *Hudspeth v. Figgins,* 584 F.2d 1345, 1348 (4th Cir.1978), *cert. denied,* 441 U.S. 913, 99 S.Ct. 2013, 60 L.Ed.2d 386 (1979). Non-physical harassment that operates to restrict access might also impinge upon that right. *Id.* But as Findings 33–37 reflect, Thomson has failed to produce credible evidence supporting his claim of harassment by Sheldon in retaliation for having filed this action.

■ 5. *City of Oklahoma v. Tuttle,* —— U.S. ——, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791 (1985) teaches the liability of a supervisory official under Section 1983 for inadequate training and control of inferior officers must stem from an "affirmative link" between the supervisor's alleged oversights and the "particular constitutional violation alleged"—here the unlawful use of force by Jones and Baskin. But as Findings 38–50 reflect, Thomson has produced no credible evidence that establishes any conduct by DeRobertis was a proximate cause of Jones' or Baskin's misconduct against Thomson.[5]

■ 6. *Wheatley v. Ford,* 679 F.2d 1037, 1040 (2d Cir.1982) indicates an award of $25,000 is neither inadequate nor excessive compensation for Thomson's hearing loss caused by Jones' excessive use of force, when conjoined with the pain and suffering and other physical injuries Thomson sustained as a result of Jones' *and* Baskin's use of excessive force. Baskin's conduct during Jones' beating of Thomson (his acquiescence and failure to intercede)

was also a proximate cause of Thomson's injuries. Given their status as joint tortfeasors, Jones and Baskin are jointly and severally liable for the compensatory damages due Thomson.

■ 7. Taking all circumstances into account, this case poses at least as egregious a situation as that presented by *Taliferro v. Augle,* 757 F.2d 157 (7th Cir.1985). Accordingly *Taliferro, id.* at 162 amply supports the requested award of $10,000 as punitive damages against Jones, and an award of the lesser amount of $5,000 against Baskin, for their respective wanton ·and malicious uses of excessive force (including in Baskin's case his tacit approval of Jones' brutality).

\* \* \*

It is therefore ordered and adjudged that plaintiff John Thomson ("Thomson") recover of defendants Earl Jones ("Jones") and Marvin Baskin ("Baskin"), jointly and severally, the sum of $25,000, and of Jones alone the further sum of $10,000, and of Baskin alone the further sum of $5,000, in each instance with interest thereon as provided by law, and that Thomson recover of Jones and Baskin, jointly and severally, his costs of action.

---

**5.** Thomson also argues for DeRobertis' liability on a ratification theory (based on DeRobertis' failure to discipline Jones and Baskin after the January 25 incident), citing for that notion to *Smith v. Rowe,* 761 F.2d 360, 369 (7th Cir.1985). That contention misreads *Smith.* There the "affirmative link" was between (1) the supervisory official's knowledge of the prisoner's mistreatment, coupled with inaction (hence "he ratified and adopted the actions of his subordinates," *id.*), and (2) the continuing mistreatment of the prisoner *thereafter.* That *Smith* situation is no different from the conventional failure to supervise that can give rise to liability if the necessary causal nexus exists.