618 F.Supp. 627 (1985)
Lowell HEDGECORTH and Charlene Hedgecorth, Plaintiffs,
v.
UNITED STATES of America, Defendant.
No. 83-0770 C (2).
United States District Court, E.D. Missouri.
July 11, 1985.
Order August 7, 1985.
*628 John S. Wallach, St. Louis, Mo., for plaintiffs.
Wesley D. Wedemeyer, Asst. U.S. Atty., St. Louis, Mo., for defendant.

MEMORANDUM
FILIPPINE, District Judge.
This matter is before the Court for a decision on the merits following trial to the Court. Plaintiffs bring this action pursuant to the provisions of the Federal Tort Claims Act 28 U.S.C. §§ 2671-2680. Plaintiff Lowell Hedgecorth alleges that he suffered a cardiovascular accident or stroke while taking a stress test at Veterans Administration ("VA") Medical Center, John Cochran Division, located on North Grand in St. Louis, Missouri. Plaintiff Lowell Hedgecorth alleges he was blinded by the stroke. Plaintiff Charlene Hedgecorth, the wife of plaintiff Lowell Hedgecorth, asserts a cause of action for loss of consortium, services and companionship as a result of the injuries suffered by plaintiff Lowell Hedgecorth. Plaintiffs claim that plaintiff Lowell Hedgecorth should never have been given the stress test, and that the giving of this test is actionable as malpractice. Plaintiffs do not maintain that the stress test was administered or performed negligently, but rather assert that it never should have been given. The Court adopts this entire memorandum as its findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52.
At the time of trial plaintiff Lowell Hedgecorth was fifty years old. Plaintiff Lowell Hedgecorth has suffered from a long history of coronary artery disease. In November of 1978 plaintiff Lowell Hedgecorth suffered a myocardial infarction ("M.I."), for which he was hospitalized. Following this M.I. Plaintiff Lowell Hedgecorth returned to work in January, 1979. Plaintiff Lowell Hedgecorth was working for a life insurance company and both sold insurance and collected premiums on policies that were already in force.
In May of 1979 plaintiff Lowell Hedgecorth married his current wife, Charlene Hedgecorth. Charlene Hedgecorth's three daughters from a prior marriage lived with Lowell and Charlene Hedgecorth after they were married. Plaintiff Charlene Hedgecorth was working for the same company that employed plaintiff Lowell Hedgecorth. Plaintiff Lowell Hedgecorth suffered from night blindness and was color blind. The pupils of plaintiff Lowell Hedgecorth's eyes are of different sizes, a condition known as anisocoria. This condition does not affect a person's vision. Plaintiff Lowell Hedgecorth had no other difficulty with his eyes prior to his blindness.
Plaintiff Lowell Hedgecorth in July of 1979 had a second M.I. and returned to work shortly following this second attack. Plaintiff Lowell Hedgecorth continued to have angina following his second M.I. On September 12, 1979, plaintiff Lowell *629 Hedgecorth was suffering severe angina and left work never to return. Plaintiff Lowell Hedgecorth at that time was being treated by Dr. David Gardner, a private physician. Dr. Gardner scheduled plaintiff Lowell Hedgecorth for a cardiac catheterization, which was performed at the St. Louis University hospital. This test revealed that plaintiff Lowell Hedgecorth had severely occluded coronary arteries, and it was recommended that plaintiff Lowell Hedgecorth undergo coronary by-pass surgery.
On October 8, 1979, plaintiff Lowell Hedgecorth was admitted to the Veterans Administration Hospital in Columbia, Missouri, for coronary by-pass surgery. Plaintiff Lowell Hedgecorth, on October 17, 1979, underwent a five vessel coronary by-pass. His remaining stay in Columbia, Missouri, was uneventful, and he was discharged on October 27, 1979. The final diagnosis by the Veterans Administration physician performing the surgery was severe coronary artery disease. Following release from the Columbia hospital, plaintiff Lowell Hedgecorth returned to St. Louis, Missouri.
Plaintiff Lowell Hedgecorth consulted Dr. Gardner for follow-up care after his return to St. Louis. However, plaintiff Lowell Hedgecorth was soon no longer able to afford private health care, so he returned to the V.A. for aid. Plaintiff Lowell Hedgecorth first consulted the V.A. in St. Louis on November 29, 1979. In addition plaintiff Lowell Hedgecorth applied for social security disability benefits in December of 1979.
In connection with his application for social security benefits plaintiff Lowell Hedgecorth was given a stress test on March 3, 1980, by Biomedical Systems. The report of this test was signed by a Dr. Biggs. This report indicated that the electrocardiogram was abnormal because of multifocal ventricular premature contractions ("VPC's"), but stated there was no evidence of ischemia.
Plaintiff Lowell Hedgecorth was seen at the V.A. Hospital on March 5, 1980, by Kenneth E. Walter, M.D. The progress notes of that March 5, 1980, visit indicate that plaintiff Lowell Hedgecorth was recently evaluated for workers compensation and had taken a stress test in connection with this evaluation. The notes indicate that the test was administered by Doctors Biggs and Weiss. Dr. Walter telephoned Doctors Biggs and Weiss's office in an effort to secure the results of this test. Dr. Walter was informed by a receptionist at their office that the test was performed for the Social Security Administration and that the results belonged to them. Dr. Walter did not ask to speak with Dr. Biggs or Dr. Weiss. In addition, Dr. Walter did not contact the Social Security Administration to determine whether he could receive the results of the test, nor did he inform plaintiff Lowell Hedgecorth that there was a difficulty in obtaining the prior stress test. The Social Security Administration, however, has a policy of sending a claimant's medical records to his physician upon receipt of a signed authorization by the claimant. The Administration verifies the signature of the claimant, and then sends the records to the physician. In addition Dr. Walter did not obtain the records of plaintiff Lowell Hedgecorth's former physician Dr. Gardner.
During the month of March plaintiff Lowell Hedgecorth was distraught over his inability to work, financial condition, and his general health. On March 20, 1980, plaintiff Lowell Hedgecorth had a follow-up visit with Dr. Walter. The purpose of that visit was to judge the progress of the treatment he was receiving. Plaintiff Lowell Hedgecorth was taking nitroglycerine for angina and was also being treated with valium and ascriptin. The ascriptin, or aspirin, was being given to help eliminate pericarditis, or inflammation of the pericardial sac that surrounds the heart. After the failed effort to secure the results of the March 3 stress test Dr. Walter on the March 20 visit scheduled the stress test that was administered on March 31, 1980.
On March 31, 1980, plaintiffs Lowell Hedgecorth and Charlene Hedgecorth arrived *630 at John Cochran V.A. Hospital for the stress test on plaintiff Lowell Hedgecorth. Dr. Walter met with plaintiff Lowell Hedgecorth prior to Lowell Hedgecorth being given the stress test. At that meeting Dr. Walter orally informed plaintiff Lowell Hedgecorth about some of the dangers in taking a stress test. Dr. Walter did not inform him of the danger of a stroke, and the informed consent form signed by plaintiff Lowell Hedgecorth did not list any dangers or side effects that could result from the stress test. Dr. Walter misread a form filled out by plaintiff Lowell Hedgecorth and mistakenly thought that plaintiff Lowell Hedgecorth was currently swimming, playing racquetball and handball.
The stress test itself was administered by Dr. Alan Glassman. The test was given in a laboratory on the second floor of the hospital in the cardiology section. Dr. Walter was not present in the laboratory while the test was being given but was in his office across the hall within 30 feet of the laboratory. Dr. Glassman and a technician were present during the test. Five and two-tenths minutes into the stress test it was terminated because plaintiff Lowell Hedgecorth had a loss of vision in his left eye and was having chest pain. Dr. Glassman sent the technician to Dr. Walter's office to ask Dr. Walter to come into the laboratory. Dr. Walter and Dr. Glassman examined plaintiff Lowell Hedgecorth.
Dr. Walter thought that plaintiff Lowell Hedgecorth was malingering or faking the loss of sight in his left eye. Within one minute of the test's termination, plaintiff Lowell Hedgecorth's vision improved but remained somewhat blurry. Following this incident Dr. Walter informed the V.A.'s day hospital of plaintiff Lowell Hedgecorth's loss of vision. Dr. Walter did not tell the day hospital that he thought plaintiff Lowell Hedgecorth was a malingerer. Dr. Walter told the day hospital that plaintiff Lowell Hedgecorth should be seen by the ophthalmology department but specifically told the day hospital that there was no urgency in plaintiff Lowell Hedgecorth being seen by ophthalmology. No written record was made of this conversation. Dr. Walter, himself, did not plan any ophthalmology consultation for plaintiff Lowell Hedgecorth. The record before the Court is unclear with regard to what medical care was given to plaintiff Lowell Hedgecorth by the day hospital immediately following the March 31, 1980, incident.
On April 8, 1980, plaintiff Lowell Hedgecorth checked himself into the Jefferson Barracks Veterans Administration Hospital. Plaintiff Lowell Hedgecorth had been turned down for social security disability benefits and as a result was severely depressed and considered suicide. The clinical record at Jefferson Barracks indicates that plaintiff Lowell Hedgecorth was having trouble with his vision and that it was getting worse. Plaintiff Lowell Hedgecorth testified that he had trouble driving to Jefferson Barracks because of his vision and thus his visual ability was declining. Plaintiff Charlene Hedgecorth could not drive plaintiff Lowell Hedgecorth to the hospital because she was hospitalized for severe depression.
Starting April 18, 1980, plaintiff Lowell Hedgecorth was examined by the ophthalmology clinic of the V.A. Plaintiff Lowell Hedgecorth was administered a series of tests which measured his field of vision. The April 18th test indicates that plaintiff Lowell Hedgecorth had lost the left half of his field of vision. Another test was performed by the V.A. on May 21, 1980, and this test showed a similar defect. The July 10, 1980, examination of plaintiff Lowell Hedgecorth indicated that his field of vision was getting even smaller. Plaintiff Lowell Hedgecorth now has a virtually one hundred percent loss of his vision. This blindness is permanent. The blindness is the result of a right occipital lobe infarct, commonly known as a stroke.
The plaintiffs maintain that plaintiff Lowell Hedgecorth suffered an infarct while taking the March 31, 1980, stress test, and that the decision to give that test was actionable malpractice because of the availability of the March 5, 1980, stress test. After careful consideration of all the evidence, *631 including the expert medical testimony, the Court agrees with plaintiffs and concludes that under the facts and circumstances of this case the giving of the stress test was both negligent and the proximate cause of plaintiffs' injuries.
The decision to administer the stress test was made by Dr. Walter, an employee of the United States who was acting within the scope of his employment. Indeed at all relevant times plaintiff Lowell Hedgecorth was being cared for by employees of the United States acting within the scope of their employment. This Court, therefore, has jurisdiction over this case and the United States is properly named as a defendant. 28 U.S.C. § 1346(b). In addition, venue is proper in the Eastern District of Missouri.
In an action brought under the Federal Tort Claims Act this Court applies the law of the state where the negligent act occurred. Thus, Missouri substantive law governs this action. Richards v. United States, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962); Stuppy v. United States, 560 F.2d 373 (8th Cir.1977). Under Missouri law a physician is required to use and exercise that degree of skill and proficiency which is commonly exercised by the ordinary skillful, careful and prudent physician engaged in the practice of medicine. Silberstein v. Berwald, 460 S.W.2d 707, 709 (Mo.1970). See also Jackson v. United States, 577 F.Supp. 1377, 1379 (E.D.Mo. 1983), aff'd, 750 F.2d 55 (8th Cir.1984); Gridley v. Johnson, 476 S.W.2d 475, 581-83 (Mo.1972). M.A.I. 11.06. In order to hold the defendant liable the negligent act must have been the direct cause of the injury suffered by the plaintiff. Silberstein v. Berwald, 460 S.W.2d at 709 M.A.I. 21.01.
This case centers around the testimony of three expert witnesses. The only expert witness presented by the defendant was Dr. Walter, plaintiff Lowell Hedgecorth's treating physician, whose decision to give the stress test is the claimed negligent act. The plaintiff presented the testimony of Dr. Howard Schwarz and Dr. John Marshall Gordon, who are both licensed to practice in this state. Dr. Gordon is a Fellow of the American Academy of Ophthalmology and has conducted a thorough examination of plaintiff Lowell Hedgecorth. Although Dr. Gordon's specialty is ophthalmology, he is familiar with stress tests and the standards for their administration. Dr. Schwarz is a specialist in emergency medicine, and at the time of trial he was president-elect of the medical staff of the St. Louis County Hospital. Dr. Schwarz has frequent contact with patients suffering from coronary artery disease. Dr. Schwarz is familiar with stress tests and refers one or two patients a month for stress testing.
Defendant argues that Dr. Gordon and Dr. Schwarz are not qualified to give expert testimony regarding stress tests because they are not cardiologists. Both Doctors Schwarz and Gordon have demonstrated to this Court that they are familiar with the appropriate standard of care with regard to stress tests. The fact that Doctors Schwarz and Gordon are not cardiologists does not render their testimony on stress testing inadmissible, but merely goes to the weight given it by this Court as the trier of fact. Harris v. Smith, 372 F.2d 806, 814 (8th Cir.1967); Frost v. Mayo Clinic, 304 F.Supp. 285, 288 (D.Minn.1969); Swope v. Printz, 468 S.W.2d 34, 40 (Mo. 1971); Pate v. St. Louis Independent Packing Company, 428 S.W.2d 744, 750 (Mo.App.1968).
The credible medical evidence presented at trial demonstrates that giving the stress test to plaintiff Lowell Hedgecorth on March 31, 1980, was a deviation from the appropriate standard of care. The purpose of a stress test is, as the name implies, to place a stress on the heart through physical exercise and thereby derive information concerning the heart's condition. Because of the nature of the test certain dangers accompany its administration. These dangers include the possibility that the patient will suffer a stroke. The patient should be warned that a stroke could result from the administration of the test, and plaintiff Lowell Hedgecorth was *632 not warned of this danger. Thus plaintiff Lowell Hedgecorth did not take the test with informed consent of its dangers.
The credible medical testimony adduced at trial further re-established that a patient should not be given a stress test if there are available adequate results from a prior stress test given less than one month prior to the subsequent test. Because of the dangers associated in giving a stress test, the results from the immediately preceding stress test should be used by the ordinary careful and prudent physician in lieu of retesting the patient. Moreover, the failure to secure the results of the March 3, 1980, stress test in the case at bar was shown by the credible medical testimony to be a deviation from the proper standard of care. The results of the prior test could easily have been secured by the defendant. The results of this March 3, 1980, test would have been sufficient for defendant's use in treating plaintiff Lowell Hedgecorth. Thus, under the circumstance of this case the inadequate efforts to secure the March 3, 1980, stress test report and the decision to give the March 31, 1980, test was negligent. As a direct result of the negligent acts and omissions of the defendant the plaintiff Lowell Hedgecorth suffered an infarct in the right occipital lobe of his brain. This stroke directly caused plaintiff Lowell Hedgecorth's total and permanent blindness.
Plaintiff Lowell Hedgecorth's blindness has severely restricted his freedom and enjoyment of life. Prior to the stroke plaintiff Lowell Hedgecorth had 20/20 visual accuity. Now, plaintiff Lowell Hedgecorth must depend on others for his needs. Prior to the stroke plaintiff Lowell Hedgecorth could read and drive a car, now he can do neither. Plaintiff Lowell Hedgecorth testified that his life was totally altered by the stroke. Plaintiff Charlene Hedgecorth has suffered a loss of companionship, services and consortium as a result of her husband's injuries. Under the facts and circumstances of this case the Court finds an award of $750,000 to plaintiff Lowell Hedgecorth is appropriate compensation. The Court will award plaintiff Charlene Hedgecorth $75,000 for her loss of consortium, services and companionship.