Karl WILLIAMS, Plaintiff,

v.

Dr. PATEL, et al., Defendants.

No. 96–1369.

United States District Court,
C.D. Illinois.

July 17, 2000.

Kathleen T. Zellner, Douglas H. Johnson, Kathleen T. Zellner & Assoc, Naperville, IL, for Karl Williams, Sr., plaintiff.

Ronald G. Stradt, Assistant Attorney General, Springfield, IL, for Dr. Patel, defendant.

## ORDER

MIHM, District Judge.

This matter is before the Court on Defendant, Ghanshyam Patel's ("Dr.Patel"), Motion for New Trial or, in the alternative, Motion for Remittitur. For the reasons stated herein, the Motion for New Trial is DENIED, and the Motion for Remittitur is GRANTED IN PART and DENIED IN PART.

## Background

On February 2, 2000, a jury found that Dr. Patel was deliberately indifferent to the medical needs of Plaintiff, Karl Williams ("Williams"), in violation of the Eighth Amendment to the United States Constitution. The jury awarded Williams $1.0 million in compensatory damages and $1.0 million in punitive damages. Judgment was entered on February 3, 2000, and Dr. Patel filed his Motion for New Trial on February 17, 2000. Accordingly, the Motion for New Trial is timely. *See* Fed.R.Civ.P. 59(b); *see also* Fed.R.Civ.P. 6(a).

At all times relevant to this case, Williams was a convicted felon housed at the Pontiac Correctional Center in Pontiac, Illinois. At trial, Williams claimed that on June 23, 1995, he sustained an injury to his left eye while performing his duties as a trash compactor operator at the prison. According to him, a hydraulic line broke loose and hit him in the left eye. Williams testified that he went to the prison emergency room on the same day that the incident occurred, June 23, 1995, but Dr. Patel refused to treat him, claiming that the sick call line was too long for him to get to Williams that day. Williams further testified that when he returned for treatment the following day, complaining of pain and loss of vision, Dr. Patel failed to conduct a hands-on examination; instead, he stood three to four feet away from Williams. According to Williams, Dr. Patel only prescribed ointment for his eye. Williams also testified that Dr. Patel made derogatory comments to him during the June 24th visit and, after another physician had started to take care of Williams on a subsequent visit, that Dr. Patel accused him of faking his pain and inability to see.

Williams was not referred to an ophthalmologist until September 20, 1995, and this referral came from the prison optometrist, not Dr. Patel. On September 21, 1995, Dr. Jerry Ringer ("Dr. Ringer"), a board-certified ophthalmologist, treated Williams for a detached retina and referred him to a retinal specialist. Dr. Ringer subsequently removed Williams' left eye on September 28, 1995.

Dr. Patel's theory in this case was that medical charts and documents established that Williams was injured by the trash compactor on either May 13 or August 5, 1995. Because Dr. Patel was not the physician who attended Williams on either of those days, he contends that he could not have been deliberately indifferent to Williams' medical needs. Dr. Patel also contended during trial that Williams never showed up at the medical facility to be examined on either June 23 or 24, 1995, as evidenced by the absence of any medical records indicating that Williams was present on either day.

## Discussion

In his Motion for New Trial, Dr. Patel argues that the following are grounds for a new trial: (1) there was insufficient evidence to support the jury's verdict; (2) the jury was erroneously instructed; (3) the Court impermissibly restricted Dr. Patel's ability to impeach Williams and Eddie Ward ("Ward"), a prisoner, by not allowing him to question these witnesses about their convictions; (4) testimony concerning Dr. Patel's foreign citizenship and Hindu beliefs tainted the trial; (5) the Court erred by denying the jury's request to review a transcript of Dr. Patel's testimony; (6) the Court erred by allowing Williams' rebuttal testimony; and (7) the jury's award of $1.0 million in both compensatory and punitive damages was grossly excessive. In his alternative Motion for Remittitur, Dr. Patel requests that this Court reduce the compensatory and punitive damages awards.

### A. Sufficiency of the Evidence

■ Only when a verdict is contrary to the manifest weight of the evidence should a motion for a new trial challenging the jury's assessment of the facts carry the day. *See Riemer v. Illinois Dep't of Transp.,* 148 F.3d 800, 806 (7th Cir.1998); *Robinson v. Burlington N.R. Co.,* 131 F.3d

648, 656 (7th Cir.1997). "As long as there is a reasonable basis in the record to support [the verdict]," it shall not be overturned. *Robinson*, 131 F.3d at 656.

■ In this case, however, Dr. Patel did not challenge the sufficiency of the evidence prior to the case being submitted to the jury. *See* Fed.R.Civ.P. 50(a). The Seventh Circuit has stated, "It is thoroughly established that the sufficiency of the evidence is not reviewable on appeal unless a motion for [judgment as a matter of law] was made in the trial court." *Thronson v. Meisels*, 800 F.2d 136, 139 (7th Cir.1986) (citation and quotation marks omitted); *see also Yohannon v. Keene Corp.*, 924 F.2d 1255, 1262 (3rd Cir.1991) ("[T]he failure to move for a directed verdict ... does more than limit an aggrieved party's remedy to a new trial. In this Circuit, it wholly waives the right to mount any post-trial attack on the sufficiency of the evidence."). However, there is a limited exception to the general rule: where the failure to review the sufficiency of the evidence would have constituted a manifest injustice. *See Thronson*, 800 F.2d at 140. The standard of review under this limited exception is "whether there was *any* evidence to support the jury's verdict, irrespective of its sufficiency, or whether plain error was committed which, if not noticed, would result in a manifest miscarriage of justice." *Id.* (citations and internal quotation marks omitted; emphasis in original).

■ Whether this Court's review of the sufficiency of the evidence were done under the "manifest weight" or the much more limited "any evidence" standard, its conclusion would be the same: a new trial is not warranted on this ground. Dr. Patel argues that the defense presented overwhelming evidence that the hydraulic hose incident occurred on either May 13 or August 5, 1995. The Court agrees that there was evidence in the record that supports such a conclusion: grievances filed by Williams in which he states the injury occurred on August 3, 4, or 5, 1995; statements allegedly made by Williams after August 5, 1995, to doctors examining his eye that the incident occurred on August 5, 1995; and medical records indicating that Williams had hydraulic oil in his eye on May 13, 1995.

However, there is also more than sufficient evidence in the record that the hydraulic hose incident occurred on June 23, 1995, and that Dr. Patel failed to properly examine Williams on either the day of the incident of the following day. No less than four witnesses testified that Williams sustained the injury to his left eye on June 23, 1995. Williams and Ward unequivocally testified that the accident had occurred on June 23rd. (Trial Tr. at 36, 102). Correctional Officer Ronald Helander ("Helander"), after being confronted with his previous deposition testimony, testified that the accident also had occurred on that date. (*Id.* at 87). Lastly, Medical Technician Mary Beth Brinkman ("Brinkman") testified that based on what she knew about the incident, it had occurred on the 23rd. (*Id.* at 214). In addition to these witnesses' testimony, Dr. Patel was confronted on recross-examination at the trial with his deposition testimony:

Q. This is at page 115 at the bottom, line 20. You were asked: "With all you know regarding Karl Williams and the situation, do you believe that he was injured here at Pontiac on June 23, 1995?" And you answered—this is at the top of 115—"From the chart it looks like it, yes".

A. From the chart.

Q. From—so that is the answer you gave to that question?

A. From the chart, yes.

(*Id.* at 341–42). Although on redirect examination Dr. Patel implied that he was confused at his deposition and that from his subsequent review of the medical records, the hydraulic hose incident did not occur on June 23rd, his conflicting trial and deposition testimony was for the trier of fact to resolve. It suffices to say that there was more than adequate evidence in the record, *i.e.*, it was not against the

manifest weight of the evidence, for the jury to conclude that the hydraulic hose incident occurred on June 23rd, a day when Dr. Patel was the doctor on duty in the emergency room.

The Court further finds that the jury's conclusion that Dr. Patel was deliberately indifferent to Williams' medical condition was not against the manifest weight of the evidence. There is sufficient evidence in the record to support a conclusion that Williams went to the emergency room on June 23rd, complaining of being hit in the face with a hydraulic line and being unable to see. Moreover, there is sufficient evidence that Dr. Patel refused to see Williams in spite of his complaints because the sick call line was too long. (*Id.* at 111). The record further supports a conclusion that Williams returned the following day and that Dr. Patel did not physically examine his eye but "diagnosed" Williams' problem from three to four feet away and merely prescribed ointment. (*Id.* at 117).

Moreover, Dr. Ringer testified that if a patient were to present himself to a general practitioner and tell the practitioner that he had been hit in the forehead with a hydraulic hose, that he had swelling, and that his vision had changed, the standard of care would require the general practitioner to "at least go through a differential diagnosis of what might cause the blurring . . . and at least make the referral or make the determination of what it was." (*Id.* at 178). Perhaps a reasonable jury could have concluded that Dr. Patel's failure to properly examine Williams on either June 23rd or 24th was merely a deviation from the standard of care, not deliberate indifference. However, a reasonable jury could have also concluded that Dr. Patel did more than deviate from the standard of care by failing to properly examine Williams on two different occasions, by taking a stand-off approach to Williams during the second examination, and by using derogatory words during the second examination. The line between deliberate indifference and medical malpractice is not always easily drawn and is properly left for the trier of fact. The Court must bow to the jury's determination in this case, as the jury's finding of deliberate indifference was, at a minimum, not against the manifest weight of the evidence.

In summary, whether the Court views the evidence in this case under the more stringent "manifest weight" standard or the "any evidence" standard, the jury's finding of liability against Dr. Patel must stand.

## B. Jury Instructions

In determining whether jury instructions are improper as to merit a new trial, the Seventh Circuit has stated:

> [O]ur review of jury instructions is limited to the determination of "whether the jury was misled in any way and whether it had understanding of the issues and its duty to determine those issues. . . . With instructions, we don't pick nits; *we examine the whole of what was given and look for overall fairness and accuracy.*"

*Trustees of Ind. Univ. v. Aetna Cas. & Sur. Co.*, 920 F.2d 429, 437 (7th Cir.1990) (quoting *Midcoast Aviation, Inc. v. General Elec. Credit Corp.*, 907 F.2d 732, 741–42 n. 7 (7th Cir.1990)).

■ Dr. Patel takes issue with two jury instructions, the first being Plaintiff's Instruction No. 7, which reads:

> Incarcerated persons must rely on prison doctors to treat their medical needs.

(Doc. # 99 at 14) (unnumbered). Dr. Patel contends that this instruction was erroneous because it "expressly implied" that Williams' case was against all of the Pontiac Correctional Center prison doctors or the medical unit as a whole. This argument is without merit. Had this been the only jury instruction, the jury *might* have been led to this conclusion. However, this jury instruction must be read in context of the other instructions that constituted the charge to the jury. In addition to the above-quoted instruction, the Court also gave the following instructions to the jury:

*The Defendant* in this case is being sued *as an individual* for *his alleged personal acts or omissions.* Neither the State of Illinois nor the Illinois Department of Corrections are parties to this lawsuit.

(*Id.* at 13) (emphasis added).

Karl Williams claims that he was injured and sustained damages and that *Dr. Patel* violated his right under the Eighth Amendment to the Constitution of the United States to be free from cruel and unusual punishment in the following respects:

Karl Williams was hit in the left eye by a hydraulic hose on or about June 23, 1995, and went immediately to the emergency room. When he was presented to *Dr. Patel* for treatment, *Dr. Patel* knew that Karl Williams had been injured and required medical examination and treatment. *Dr. Patel* refused to examine or treat Karl Williams at that time, in spite of the serious need to do so, and ordered him out of the emergency room area. Karl Williams returned to the emergency room on June 24th, and claims that he was not examined or lawfully treated by *Dr. Patel,* in that *Dr. Patel* never examined his eye, and only prescribed ointment to treat the eye relating to his injury. *Dr. Patel's* conduct constituted a conscious or reckless disregard of the serious medical needs of Karl Williams. As a result of the hydraulic hose accident on or about June 23, 1995, Karl Williams suffered a detached retina. Because he did not receive necessary medical examination, treatment, and referral by *Dr. Patel* at the time of the injury, the eye ultimately had to be surgically removed.

Karl Williams further claims that the foregoing was the proximate cause of his injuries.

*Dr. Patel* denies that he was called upon to examine or treat Karl Williams on the 23rd or 24th of June, 1995. He denies that he ever refused to examine or treat Karl Williams, denies that he ever ordered him out of the emergency room, denies that he ever knew that Karl Williams had suffered a serious eye injury that required immediate examination and treatment, and denies that he is in any way responsible for any serious injury to Karl Williams.

(*Id.* at 16–17) (emphasis added).

Prison officials violate the Eighth Amendment ... when their conduct demonstrates deliberate indifference to the serious medical needs of a prisoner. The appropriate standard requires you to consider two elements.

First, the deprivation suffered by Karl Williams must be, objectively, sufficiently serious that it constitutes a denial of the minimal civilized measures of life's necessities. In the context of medical care, a condition is serious when the failure to provide treatment could result in further significant injury or the unnecessary and wanton infliction of pain.

The second element is that *Dr. Patel* acted with culpable state of mind, that is, that he was deliberately indifferent to Karl Williams' condition. Deliberate indifference means that *Dr. Patel* consciously disregarded an excessive risk to Karl Williams' health or safety. *Dr. Patel* must have been both aware of facts from which the reasonable inference could be drawn that a substantial risk of serious harm existed, and he must have also have drawn that inference. Deliberate indifference does not require that *Dr. Patel* intended Karl Williams to suffer serious injury. However, negligence or even gross negligence by *Dr. Patel* is not enough to establish a[c]onstitutional violation.

(*Id.* at 18) (emphasis added).

The parties in this case are: Plaintiff, Karl Williams

Defendant, Ghanshyam Patel

(*Id.* at 24).

Contrary to Dr. Patel's argument, the instructions to the jury, when read as a whole, did not imply, expressly or otherwise, that Williams' case was against all prison doctors, the medical unit at the

correctional facility, or even the Department of Corrections. The foregoing jury instructions make it explicitly clear that Williams' Eighth Amendment claim was brought solely against Dr. Patel and that no reasonable jury could have concluded otherwise.

■ Dr. Patel next contends that Plaintiff's Instruction No. 7 was a misstatement of the law. This argument is outside the scope of Dr. Patel's objection during the jury instruction conference. In objecting to this instruction, counsel for Dr. Patel stated:

For the record I would like to restate my objection to that. The phrase "prison doctors" may be misleading to the jury as this is not a case against the prison doctors but one doctor.

(Trial Tr. at 357). Absent from this objection is any argument that Plaintiff's Jury Instruction # 7 was a misstatement of the law, and Dr. Patel will not now be allowed to raise this objection for the first time in a post-trial motion. *See* Fed.R.Civ.P. 51 ("No party may assign as error the giving of or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection."); *see also Carter v. Chicago Police Officers,* 165 F.3d 1071, 1077–79 (7th Cir.1998) (strictly applying this rule and, therefore, foregoing plain error analysis). Moreover, the Court notes that the authority for Plaintiff's Jury Instruction # 7 is the United States Supreme Court case of *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), in which the Court stated, "An inmate must rely on prison authorities to treat his medical needs; if those authorities fail to do so, those needs will not be met." The use of the word "doctors" in the instruction given in this case is merely a result of tailoring the instruction to the facts of this case since only the actions (or non-action) of Dr. Patel were at issue.

Dr. Patel also argues that Plaintiff's Jury Instruction # 7 was misleading because it fails to take into account that certified medical technicians ("CMT") play a role in treating prisoners for medical needs and was incorrect because it absolved Williams of any responsibility he might have had in seeking medical care. Again, Dr. Patel made neither of these arguments in the context of his objection to this jury instruction. *See* Fed.R.Civ.P. 51; *see also Carter,* 165 F.3d at 1077–79. Moreover, although in some other context the role of CMTs may be pertinent, there is no evidence that a CMT was capable of diagnosing and treating a detached retina or that a CMT had the authority to refer a prisoner to an outside medical specialist. Also unavailing is Dr. Patel's argument that Plaintiff's Jury Instruction # 7 was incorrect because it absolved Williams of any duty he had to seek medical care. To any extent that a prisoner can be at fault for violating his own civil rights, Dr. Patel had every opportunity to raise this defense and a jury instruction addressing this defense. He did neither.

Dr. Patel also takes issue with Plaintiff's Jury Instruction # 11. The instruction, as modified, reads:

If you should find that a party or person or persons acting with knowledge of a party willfully suppressed evidence in order to prevent its being presented in this trial, you may consider such suppression in determining what inferences to draw from the evidence or facts in the case against him.

(Doc. # 99 at 15). In his Motion for New Trial, Dr. Patel argues, "As objected to on the record, said jury instruction is misleading in that it implies the case to be actually against other prison officials in addition to Dr. Patel." (Dft. Mem. at 4). He further argues that the instruction was misleading because there was no evidence presented at trial to suggest that any party had suppressed evidence in the case. (*Id.*).

Respectfully, Dr. Patel's post-trial memory concerning the scope of his objection is incorrect. His objection to this instruction was:

We would object as we did yesterday *just on the fact that I don't think there has been any evidence* that anyone acted in concert with anyone else to suppress anything and we would just like to re-state our objection on the record.

(Trial Tr. at 357–58) (emphasis added). Accordingly, Dr. Patel has waived any argument that this instruction implied that the case was against individuals in addition to him. *See* Fed.R.Civ.P. 51. Moreover, as previously explained, a reading of the instructions as a whole does not reasonably lead to this conclusion.

However, because Dr. Patel did object on the ground that the evidence did not support the giving of the instruction, the Court will address this argument. Dr. Patel argues, "The above instruction was particularly prejudicial to defendant since there were no medical records, emergency room log entries or prescription records to substantiate plaintiff's allegations of being seen or treated by defendant on June 23, 1995." (Dft. Mem. at 4). This, in light of other evidence in the record, is precisely what led to the giving of this instruction. As previously discussed, at least four witnesses substantiated that Williams' injury occurred on or about June 23, 1995. Further, there was testimony that Williams went to the emergency room on the day of the injury and the following day. However, there are no records of any such visit or of the prescription of ointment by Dr. Patel on June 24th. Testimony at trial established that doctors at the correctional center have access to inmates' medical records at all times. (Trial Tr. at 288). Inmate medical records include any resident injury reports filled out concerning inmate injuries. (*Id.* at 291). Moreover, Ron Gruber, the director of medical records at the correctional center, testified that an injury to the eye is of sufficient seriousness that a resident injury report should have been generated. (*Id.*). Williams' medical records were devoid of any such report, yet they included reports for minor injuries such as bee stings and splinters. Lastly, Dr. Patel's deposition testimony raised serious questions as to the existence or non-existence of medical records concerning Williams' injury. As previously explained, Dr. Patel testified during his deposition that "from the chart" it appeared Williams was injured on June 23, 1995. (*Id.* at 342). Yet, as he argues in his post-trial motion, there are no medical charts or records in the court record indicating that any injury occurred to Williams on June 23rd. Accordingly, to which chart was Dr. Patel referring in his deposition?

On the one hand, there is a simple and innocent explanation for the lack of medical records for June 23rd and 24th: Williams was not injured on either date and, therefore, did not seek treatment on either date. However, there is also an equal inference that could have been drawn in light of the lack of medical documentation for these dates: the records were willfully suppressed. Based on the record before the Court, it finds that it was not erroneous for the jury to be given the willful suppression instruction, and, accordingly, a new trial is not warranted as a result of that instruction.

## C. Evidence of Williams' and Ward's Convictions

Dr. Patel next argues that this Court impermissibly restricted his ability to impeach Williams and Ward concerning their felony convictions pursuant to Federal Rule of Evidence 609(a)(1). According to Dr. Patel, this Court, in restricting his ability to impeach these witnesses, did not properly conduct the balancing inquiry called for under the rule. *See* Fed.R.Evid. 609(a)(1) (requiring application of Rule 403 balancing test).

Prior to trial, this Court stated to the parties:

I think we had previously discussed and *agreed* that the jury would be informed that the plaintiff had a prior felony conviction without identifying what it was. Is that correct? And I'm going to tell them that right up front.

(Trial Tr. at 3–4) (emphasis added). There was no objection from Dr. Patel, and with-

out any such objection, there was no need to undergo the balancing test inquiry set forth in Rule 403. Moreover, the Court finds that it was not plain error for it not to undergo the balancing inquiry in spite of no objection from Dr. Patel. Admittedly, credibility was crucial in this case. However, as previously explained, there was testimony from at least two Department of Corrections employees (three if you count Dr. Patel's impeaching deposition testimony) from which the jury could find that the injury to Williams occurred on June 23rd.

Equally unavailing is Dr. Patel's argument that this Court erred in not allowing his attorney to impeach the credibility of Ward with evidence of his conviction. During trial, the following exchange took place:

Q. Mr. Ward, for what crime are you currently incarcerated?

MR. JOHNSON: Objection.

A. Murder.

THE COURT: Just a moment. Why is this any different than how we decided to deal with this on the plaintiff?

MR. NOREUIL: Goes to credibility, Your Honor.

THE COURT: Well, we'll have a side bar on this.

\* \* \* \* \* \*

THE COURT: My question is what is the relevance of the jurors knowing anything more on this than the fact he is serving time for a felony?

MR. NOREUIL: *Your Honor, if we can get in the fact and stipulate the he is serving time for a felony, that's fine, but it goes to credibility.*

THE COURT: Of course it does, but I mean I assume we would have had the same understanding as to not just plaintiff but anybody else. We could just say they're serving time for a felony.

\* \* \* \* \* \*

THE COURT: Let me just deal with this now. Mr. Ward, without telling us what you have been convicted of, is it fair to say that you have been convicted of a felony offense and are serving time for that offense?

A. Yes, sir.

(Trial Tr. at 44–45) (emphasis added).

There are at least two reasons why a new trial cannot be granted on the basis of Dr. Patel's inquiry concerning Ward's conviction being limited by the Court. Ward's specific answer of "murder" was never stricken from the record, and the Court did not instruct the jury to disregard the answer. However, to the extent the jury disregarded Ward's answer of "murder" as a result of the Court's exchange with counsel and its belated instruction to Ward not to specify the offense for which he was currently incarcerated, Dr. Patel's counsel stated during the side bar that it was "fine" if he could just get into evidence that Ward was serving time for a felony. *At a minimum,* this occurred. Accordingly, Dr. Patel will not now be heard to claim prejudicial error.

## D. Prejudicial Testimony and Statements

Dr. Patel argues in his Memorandum of Law that during his cross-examination, Williams' counsel questioned him concerning his national citizenship and Hindu beliefs in an effort to portray him as a Hindu of privilege with little regard for the lower members of the caste system. Respectfully, Dr. Patel's attorney incorrectly characterizes the questions on cross-examination. At no time during Dr. Patel's cross-examination did Williams' counsel question him concerning his Hindu beliefs. Williams' counsel did question Dr. Patel concerning his national citizenship, but such questions were asked in the context of his understanding of the United States Constitution, and more specifically, the Eighth Amendment. (Trial Tr. at 328–32). The Court further notes that Dr. Patel's counsel did not object to a single question concerning the doctor's nationality and background. *See United States v. Levy,* 741 F.2d 915, 924 (7th Cir.) (failure to object to testimony at trial limits review to the identifica-

tion of a plain error), *cert. denied,* 469 U.S. 1021, 105 S.Ct. 440, 83 L.Ed.2d 366 (1984).

Williams' attorney did ask Dr. Patel about his father's occupation in India, to which Dr. Patel testified that his father was a chief or mayor of a city. The relevance of this question and testimony is not clear, and, perhaps, Williams' attorney was attempting to establish that Dr. Patel had certain views about the caste system that affected his treatment, or lack thereof, of Williams. However, this testimony was not further developed and, moreover, Dr. Patel's attorney did not object to opposing counsel's questions about Dr. Patel's father's occupation in India. Because the testimony was not developed in any meaningful manner, the Court fails to see how such testimony was so plainly prejudicial as to warrant a new trial in spite of counsel's failure to object.

Dr. Patel further argues that in addition to this line of questioning during cross-examination of him, there were also improper questions of and testimony from Williams concerning Dr. Patel's Hindu beliefs and the Indian caste system. Dr. Patel overstates Williams' testimony. A review of the transcript reveals that Williams never mentioned the caste system in India or discussed Hindu beliefs when he testified. The following exchange took place during the trial concerning this subject:

Q. Now you had said earlier that—I believe you had said something about Dr. Patel acted like you were untouchable because you were a trash collector?

A. Yes, ma'am.

Q. Did you subsequently gain information about why Dr. Patel might not have been willing to touch you when he examined you?

A. Yes, ma'am. I had saw a Discovery program on India and I went and pulled a book on this and read it.

MR. NOREUIL: Your Honor, I will object.

THE COURT: Are you offering him as an expert witness?

MS. ZELLNER: I'm offering him as having information about why he was treated the way he was.

THE COURT: I'll sustain the objection, at least at this point and time. You can certainly ask Dr. Patel about that when he testifies, and if you lay a proper foundation I will even allow you to do it with this witness, but I don't believe you have done that at this point.

BY MS. ZELLNER:

Q. You described to us previously that when Dr. Patel saw you on June 23 and 24, he had not touched you?

A. No, ma'am.

Q. When you were in the hospital and observing Dr. Patel around other prisoners, did you ever observe him touching them?

A. No, ma'am.

Q. Do you recall the book that you read about India?

THE COURT: I have already indicated that that's not appropriate, so this question is not appropriate. The jury is instructed to disregard this line of questioning. It's not appropriate at this point.

(Trial Tr. at 130–31). This testimony does not warrant a new trial. The jury was specifically directed to disregard it, and it was not so developed as for this Court to believe that the jury had any difficulty in following the Court's direction. Moreover, the Court does not believe that this testimony, even when read in light of questions of Dr. Patel on cross-examination concerning his father's occupation, was so prejudicial as to warrant a new trial in this case.

The Court now turns to Dr. Patel's argument that one of Williams' attorneys made prejudicial comments during her closing argument. During closing arguments, Williams' attorney stated, "Now I want to show you this calendar because the State seems to be suggesting that maybe—maybe this inquiry occurred on May 13." (*Id.* at 385–86). She further stated during closing argument, "But the

State wants you to think oh, he put August 3 on there." (*Id.* at 390).

Prior to trial, Dr. Patel had moved in limine to prohibit Williams' attorneys from referring to Dr. Patel's attorneys as Assistant Attorneys General. The Motion was granted. Dr. Patel argues that these references to "the State" violated the Court's order and were prejudicial to him because the comments implied that the case was against the State of Illinois instead of or in addition to him.

Williams argues that these remarks were not a violation of the Court's order because his attorney did not refer to Dr. Patel's attorneys as Assistant Attorneys General. Technically, he is correct. However, counsel's references to "the State" certainly violated the spirit of the Court's order, as the intent behind both Dr. Patel's oral Motion in Limine and the Court's order was that the jury should not be confused as to whom this case was against. Nevertheless, these two isolated comments were not prejudicial. In light of the multiple references to Dr. Patel as "the" Defendant throughout closing arguments by both parties and the jury instructions that clearly stated Dr. Patel was "the" Defendant in the case, the Court does not believe that the isolated remarks by Williams' counsel to "the State" would have led a reasonable jury to conclude that the State of Illinois was also a party to this action.

### E. The Jury's Request for a Transcript

■ During its deliberations, the jury requested, *inter alia*, a copy of the transcript of Dr. Patel's testimony. Dr. Patel now argues that this Court erred in instructing the jury to rely on its collective memory concerning Dr. Patel's testimony. Specifically, he argues, "[T]he jury, as evidenced by their request to see the trial transcript of defendant, demonstrated a clear difficulty in understanding the defendant.... If ever a case of abuse of discretion existed, [the Court's failure to provide a copy of the transcript] is it." (Dft. Mem. at 9).

Dr. Patel did not voice any objection at trial when this Court told the parties that it intended to inform the jury that a transcript of Dr. Patel's testimony did not exist. On this subject, the following exchange took place:

THE COURT: Does defense counsel have any different view of this?

MR. NOREUIL: [I] just had a question about testimony. Is that unavailable for any transcript of any witness? Is that correct?

THE COURT: That's correct.

\* \* \* \* \* \*

THE COURT: Let me write out my response here and see what you think. You may have this available to you.

\* \* \* \* \* \*

As to question two, a transcript of Dr. Patel's testimony does not exist. Please call upon your collective memory.

\* \* \* \* \* \*

Do we all agree on that?

MS. ZELLNER: Yes.

MR. NOREUIL: Yes.

(Trial Tr. at 419–20).

Aside from not objecting to this Court telling the jury a transcript did not exist and to rely on its collective memory, it is pure speculation on Dr. Patel's part that the jury did not understand his testimony as a result of his accent. If anything, Dr. Patel's contention that the jury could not understand him is objectively refuted by the record. The Court had instructed the members of the jury on the first day of trial "if at any time you don't hear something or need to have it repeated, certainly I want you to raise your hands." (Trial Tr. at 67). The record does not reveal that any juror ever raised his or her hand during Dr. Patel's testimony, and Dr. Patel does not contend otherwise.

Certainly, it was within this Court's discretion to have its court reporter read back portions of Dr. Patel's testimony or, perhaps, to have even had her quickly

prepare a hard copy of his testimony. *See United States v. Adcox,* 19 F.3d 290, 293 (7th Cir.1994). However, as there was absolutely no indication from the jury's request for a transcript that it misunderstood any of Dr. Patel's testimony and because the length of the trial was short (two days of testimony, with Dr. Patel testifying on the second day), the jury's collective memory of his testimony should have been sufficiently fresh. *See id.* Accordingly, the Court finds that its decision not to provide the jury with a copy of Dr. Patel's testimony does not require a new trial.

### F. Williams' Rebuttal Testimony

After Dr. Patel testified, Williams was called by his attorney for rebuttal testimony. During his rebuttal testimony, Williams testified regarding an examination of him conducted by Dr. Patel on March 23, 1995. According to Dr. Patel, this testimony was cumulative and a needless consumption of time.

When Dr. Patel objected to this testimony at trial, the Court found that the testimony from Williams concerning the March 23rd examination was appropriate, and Dr. Patel has provided no reason for this Court to reconsider its previous evidentiary ruling. (Trial Tr. at 347). Contrary to Dr. Patel's statement in his Memorandum of Law, Williams was not allowed to "parade his story yet again to the jury . . . ." (Dft. Mem. at 15). Williams' testimony concerning the March 23rd examination consisted of two questions and five lines of testimony, which was not particularly earth-shattering testimony.

### G. Excessive Awards of Damages

Dr. Patel makes various arguments concerning the awards of compensatory and punitive damages. Concerning the compensatory damages award, he argues:

> In the case at bar, the award of $1,000,000 [in] compensatory damages was monstrously excessive, given the fact that plaintiff was incarcerated throughout the course of his injury. As such, plaintiff had no out of pocket expenses, no medical expenses, and no future medical expenses until the year 2018 (the earliest possible date of plaintiff's release from incarceration). Moreover, it was plain error to give a jury instruction outlining the mortality table (plaintiff's jury instruction No. 12) and not also providing the jury with information of the duration of plaintiff's incarceration. As such, defendant seeks a new trial on these grounds, or, in the alternative, a reduction in the amount of the compensatory damages award.

(Dft. Mem. at 16). Aside from also citing a Seventh Circuit case that stands for the well-known proposition that there must be a rational connection between the award and the damages sustained by a plaintiff, *see U.S. E.E.O.C. v. AIC Sec. Investigations, Ltd.,* 55 F.3d 1276, 1285 (7th Cir. 1995), this is the sum total of Dr. Patel's arguments concerning the award of compensatory damages. The arguments do not warrant a new trial.

■ With regard to the mortality table instruction, Dr. Patel did not object at trial to the giving of that instruction and will not now be heard to complain about it in his post-trial motion. *See* Fed.R.Civ.P. 51. Moreover, the relevance of that mortality table instruction is plainly evident from the record. Williams was seeking, *inter alia,* future damages for "suffering reasonably expected in the future." (Doc. # 99). Immediately after instructing the jury on the elements of compensatory damages, the Court gave the mortality table instruction, which instructed the jury as to the life expectancy of a black male of Williams' age.

The Court also fails to appreciate how Williams' projected year of release from prison was germane to the compensatory damages issue. Both prisoners and non-prisoners who lose eyes certainly can be compensated for bodily injury, past and future suffering, disability, and disfigurement. These damages are not unique to non-prisoners. Had Williams sought damages for loss of future income, Dr. Patel's

argument would be relevant. However, he did not seek such damages, and Dr. Patel has otherwise failed to explain how Williams' year of release is relevant.

■ The Court also finds Dr. Patel's argument that an award of $1.0 million is monstrously excessive, thereby requiring a new trial, to be without merit. The Seventh Circuit has stated:

> When reviewing a compensatory damages award, we make three inquiries: whether the award is "monstrously excessive"; whether there is no rational connection between the award and the evidence, indicating that it is merely a product of the jury's fevered imagination or personal vendetta; and whether the award is roughly comparable to awards made in similar cases.

*AIC Security,* 55 F.3d at 1276. Dr. Patel does not explain how an award of $1.0 million for the loss of an eye is monstrously excessive. Although he correctly argues that Williams has had no out-of-pocket expenses and will have no such expenses as long as he remains in prison, this argument does not begin to scratch the surface of the monstrously excessive issue in this case. The argument does not take into account the pain, suffering, disfigurement, and disability, *i.e.,* the elements of compensatory damages in this case, occasioned by Williams' loss or the testimony from Dr. Ringer that Williams could very well lose his sight in his other eye as a result of the removal of his left eye or, at a minimum, will be required to remain on steroids to preserve what vision he currently has in his right eye. This Court cannot conclude that a $1.0 million compensatory damages award for the loss of at least 50% of one's sight, the likelihood of the loss of vision in the other eye, and the pain, suffering, and disfigurement occasioned by the loss of any eye is so monstrously excessive as to warrant a new trial.

With regard to the second inquiry the Seventh Circuit has directed courts to undertake when evaluating an award of compensatory damages, the Court finds that there is a rational connection between the $1.0 million award and the evidence in this case for the same reasons that it has found that the award was not monstrously excessive.

Regarding the third inquiry discussed in *AIC Security,* Williams has cited two cases in which the jury awarded substantial sums of money to plaintiffs whose respective vision was damaged by a defendant's malfeasance. In *Gautreaux v. Scurlock Marine, Inc.,* 107 F.3d 331, 334, 339 (5th Cir.1997), the plaintiff was awarded $736,925 in compensatory damages for his loss of an eye during an accident. Of this amount, however, only $300,000 was for past and future pain and suffering and disability. The remaining $436,925.00 was for lost wages, future lost wages, and medical expenses. *See id.* at 334 n. 2. In *Hedgecorth v. United States,* 618 F.Supp. 627, 632 (E.D.Mo.1985), a 50–year–old plaintiff was awarded $750,000 in compensatory damages for the total blindness he suffered as a result of the acts or omissions of the Veteran's Administration in administering a stress test. It is unclear from the *Hedgecorth* opinion what elements of compensatory damages were before the jury.

Williams also cites to the Seventh Circuit case of *Haley v. Gross,* 86 F.3d 630 (7th Cir.1996). In *Haley,* the plaintiff, a prisoner at the Menard Correctional Facility, was awarded $1.65 million in compensatory damages. The plaintiff had suffered severe burns from a fire started by his cell mate, which resulted in the plaintiff undergoing extensive and painful skin grafts and months of recovery. *See id.* at 633. The jury found that the defendant state actors had been deliberately indifferent to the plaintiff's safety. *See id.* at 632. The amount of the compensatory damages award, however, was not at issue on appeal, *see id.* at 633 n. 2, and there is no indication in the *Haley* opinion whether the amount of the award had been previously examined by the district court.

Although this case is distinguishable from *Gautreaux,* in that lost income and

medical expenses were not elements of damages in this case, and distinguishable from *Hedgecorth,* in that Williams has not suffered total blindness, the Court does not believe that a comparison of these cases to this case supports a finding that the $1.0 million compensatory damages award indicates that the jury in this case was so inflamed by passion or prejudice when it found Dr. Patel liable and made its award. Furthermore, although the plaintiff in *Haley* suffered from a different type of injury than Williams and the Seventh Circuit was not presented with the issue of the reasonableness of the award, the Court believes that *Haley* further supports the conclusion that a new trial is not warranted. The award in this case was, at least marginally, roughly comparable to the compensatory damages awards in *Gautreaux, Hedgecorth,* and *Haley.*

However, the Court believes that, based on *Gautreaux* and *Hedgecorth,* a remittitur is necessary. As previously pointed out, the majority of damages awarded in *Gautreaux* were for past and future lost wages and medical expenses, not for pain, suffering, and disfigurement. In *Hedgecorth,* the plaintiff completely lost his eyesight, whereas in this case, Williams can still see out of his right eye. The Court acknowledges, however, that Dr. Ringer testified that "at the minimum, [Williams will] be on steroid treatment ... for possibly the rest of his life [in order to save the vision in his right eye] and that eye has the possibility of going on to further damage and complete loss of vision" as a result of Williams' having lost his left eye. (Trial Tr. at 171).

Taking into account the distinctions between this case and *Gautreaux* and *Hedgecorth* and the jury's evaluation of the elements of damages in this case, to which this gives substantial deference, the Court finds that the compensatory damages must be reduced from $1.0 million to $750,000.

The Court now turns to the issue of punitive damages. Dr. Patel makes four arguments as to why an award of punitive damages was improper in this case: (1) the

award violated the principles of substantive due process; (2) the amount of the award is a windfall for Williams; (3) the award of punitive damages was not necessary to deter; and (4) it is excessive when compared to punitive damages awards in other cases. In the alternative, he requests a remittitur of the award.

In support of his due process argument, he cites the Supreme Court cases of *TXO Production Corp. v. Alliance Resources Corp.,* 509 U.S. 443, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993), and *Pacific Mutual Life Insurance Co. v. Haslip,* 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991). Interestingly, in the face of a due process challenge, the *TXO Production* Court affirmed a punitive award of more than 526 times the amount of compensatory damages and the *Pacific Mutual* Court affirmed a punitive award that was four times the amount of compensatory damages. In this case, we are dealing with a 1:1 ratio between the award of compensatory damages and punitive damages, which, at least in the abstract, is eminently reasonable. Of course, this Court is aware that the Supreme Court has "eschewed an approach that concentrates entirely on the relationship between actual and punitive damages." *TXO Production,* 509 U.S. at 460, 113 S.Ct. 2711.

Dr. Patel urges this Court to use the factors set forth by the Supreme Court in evaluating whether his right to substantive due process was violated in this case and to conclude that, in fact, he was deprived of this right. These factors are: (a) the harm inflicted on the plaintiff; (b) the reprehensibility of a defendant's conduct; (c) the likely potential harm to others arising from the complained of conduct; and (d) the wealth of the defendant. *See generally TXO Production,* 509 U.S. at 460–64, 113 S.Ct. 2711.

The Court quickly disposes of the fourth factor, as Dr. Patel failed to introduce any evidence concerning his wealth despite having the opportunity to do so during the course of the trial. This tacti-

cal decision on the part of his attorneys will not now serve as a basis for either negating or reducing the award of punitive damages. Additionally, although not argued by Dr. Patel, Williams had no burden to introduce evidence of Dr. Patel's wealth. *See generally Kemezy v. Peters,* 79 F.3d 33 (7th Cir.1996). Therefore, error cannot be assigned as a result of Williams' decision not to introduce such evidence.

Equally unavailing is his argument that Williams was not seriously injured by his conduct. He wisely forgoes any argument that a loss of any eye is not serious. Instead, he argues that the testimony from Dr. Ringer revealed that had Williams been referred to an ophthalmologist as late as August, 1995, it is likely that the vision in his left eye would have been saved. As pointed out by Dr. Patel, there is evidence in the record indicating that another doctor at the correctional center attempted to refer Williams to an eye specialist on August 5, 1995, but the referral, for whatever reason, did not result in an outside examination. The Court has read Dr. Ringer's testimony and has not found any testimony from him that a successful referral in August, 1995, would have likely resulted in Williams' eye being saved. Dr. Ringer did testify that an earlier referral would have increased the chances of a successful retinal attachment surgery. (Trial Tr. at 167). This, in turn, means that a referral from Dr. Patel as early as June 23 or 24, 1995, would have greatly increased the probability of saving Williams' left eye. However, such a referral never occurred. Accordingly, Dr. Patel cannot argue that his deliberate indifference towards Williams' medical needs did not inflict harm on Williams.

██ The Court also finds that the reprehensibility of Dr. Patel's conduct indicates that an award of $1.0 million in punitive damages was not violative of substantive due process principles. Based on the jury's findings, Dr. Patel twice failed to conduct any meaningful examination of Williams after being presented with complaints, which Dr. Ringer testified should have led, at a minimum, to an outside referral. Dr. Patel's hands-off, completely disinterested approach to Williams' serious problem, in conjunction with his derogatory remarks, are indicative of reprehensible conduct warranting punishment.

Lastly, the Court finds that the likelihood of potential harm to others by the type of conduct exhibited by Dr. Patel's towards Williams also supports a finding that the award of punitive damages did not violate substantive due process principles. If future prisoner patients were to receive the same deliberately indifferent treatment from Dr. Patel as that received by Williams, the impact of such care would be immeasurable and could very well result in something much worse than a loss of any eye.

Based on the foregoing, the Court finds that the jury's award of $1.0 million in punitive damages was not inconsistent with substantive due process principles.

██ Dr. Patel next argues that an award of punitive damages cannot be a windfall, but must be based on the evidence in the record. The Court wholly agrees with this principle. *See Hennessy v. Penril Datacomm Networks, Inc.,* 69 F.3d 1344, 1352 (7th Cir.1995). However, he fails to explain in a convincing manner how the record does not support an award of punitive damages. His view of the record, which the jury wholly rejected, is that he is not liable at all for any of the harm caused to Williams. Based on the fact that the jury found that Dr. Patel was deliberately indifferent and because the record supports a finding that Dr. Patel callously disregarded a severe injury to Williams' eye despite being given two opportunities to conduct a proper and meaningful examination, the Court cannot find that the jury's award was not rationally connected to Dr. Patel's misconduct.

The Court also rejects Dr. Patel's argument that the award of punitive damages was not necessary in this case for deter-

rence purposes because his conduct was, at worst, grossly negligent. Again, apparently, the jury did not agree. If his conduct had been only grossly negligent, he would not have been held liable. (Doc. # 99) ("However, negligence or even gross negligence by Dr. Patel is not enough to establish a Constitutional violation."). As the finder of fact, the jury was called upon to make a moral judgment as to whether Dr. Patel's conduct was sufficiently egregious as to warrant punitive damages. *See Merriweather v. Family Dollar Stores of Indiana, Inc.*, 103 F.3d 576 (7th Cir.1996). Moreover, the jury was specifically instructed that it was to consider the deterrent value, if any, of any such award. (Doc. # 99). Dr. Patel has provided this Court with no justification to invade the province of the jury's moral judgment that punitive damages were necessary, in part, to deter conduct of a similar nature in the future.

■ The Court now turns to Dr. Patel's final argument—the punitive award is excessive when compared to awards made in other cases. At the outset, the Court rejects this argument to the extent that Dr. Patel is arguing that the award indicates a fevered imagination or irrationality on the part of the jury, thereby necessitating a new trial. The 1:1 ratio between the compensatory and punitive awards is, in this Court's belief, indicative of a rational jury that was not infected by partiality, sympathy, or outrage when it made the punitive award. This conclusion is equally supported by the evidence in the record indicating that Dr. Patel's indifference towards Williams' medical needs exhibited, at a minimum, a callous disregard as both a medical doctor and, equally important, a state actor.

However, the Court agrees with Dr. Patel that awards in other similar cases indicate the necessity of a remittitur. As with awards of compensatory damages, awards of punitive damages in similar cases serve as a guideline for courts in determining whether to order a remittitur. *See Bogan v. Stroud,* 958 F.2d 180, 186 (7th Cir.1992).

Dr. Patel cites to *Bogan* and *Cooper v. Casey,* 97 F.3d 914 (7th Cir.1996), in support of his argument that the punitive award in this case is excessive. In *Bogan,* the three correctional officers had used retaliatory force against an inmate in the form of beating, kicking, and, perhaps, even using the inmate's own knife on him after he was disarmed and subdued. The jury awarded the inmate nothing in compensatory damages and a total of $7,000 in punitive damages ($5,000 against one officer and $1,000 against the other two). On appeal, the Seventh Circuit affirmed this award. *Bogan,* 958 F.2d at 186.

In *Cooper,* the jury awarded each of the two inmate plaintiffs $5,000 in compensatory damages and $60,000 in punitive damages. *See Cooper,* 97 F.3d at 916. The jury in *Cooper* found that the defendant correctional officers threatened to remove the plaintiffs' handcuffs and fight them after one of the plaintiffs allegedly embarrassed one of the guards in front of his captain. The officers subsequently removed the handcuffs and kicked, beat, and maced the plaintiffs, inflicting cuts, severe muscular pain, and, as a result of using the mace, a burning sensation in their eyes and skin. *Id.* The plaintiffs subsequently pleaded for medical attention, to which one of the officers replied, "Fuck y'all." *Id.* On appeal, the Seventh Circuit upheld the punitive damage awards against the officers, the highest award being "only $22,500." *Id.*

The last case cited by Dr. Patel in support of his argument that the punitive award in this case is excessive is the Northern District case of *Thomson v. Jones,* 619 F.Supp. 745 (N.D.Ill.1985). In *Thomson,* the defendant correctional officers were found liable in a bench trial for malicious use of excessive force after an inmate refused to cooperate in a cell extraction. The excessive force resulted in the plaintiff suffering a loss of hearing. The district court awarded the plaintiff $25,000 in compensatory damages and $15,000 in punitive damages ($10,000

against one officer and $5,000 against the other). *See id.* at 754.

Williams argues that these cases are distinguishable because there was misconduct on the part of the inmate plaintiffs that contributed to the defendant correctional officers' unconstitutional conduct. In this case, he argues, there is no indication that he acted in an inappropriate or provoking manner towards Dr. Patel at any time. While there was certainly misconduct on the part of the plaintiffs in *Bogan* and *Cooper*, the Court is not convinced that the misconduct on the part of those plaintiffs bridges the gap between the punitive awards in those cases and the $1.0 million award in this case. Of the three cases cited by Dr. Patel, the largest punitive award was made in *Cooper* ($60,000), and the plaintiffs' contributory misconduct in that case was minimal, if any. Moreover, the Court believes that the correctional officers' misconduct in *Cooper* was at least as egregious as Dr. Patel's conduct in this case.

Williams has not cited any cases in which a prisoner, or any other person, has been awarded punitive damages even close to the amount awarded in this case for conduct similar to that of Dr. Patel's. In fact, he cites no cases at all. Instead, his sole argument is that the three cases cited by Dr. Patel are distinguishable.

Given the severity of the conduct in *Cooper* and the severity of the conduct in this case, this Court cannot justify a punitive award of $1.0 million. However, this Court also believes that *Cooper* and the other cases cited by Dr. Patel set the ceiling on punitive awards for constitutional violations of the magnitude seen in this case. It is important to note that none of the plaintiffs in *Bogan, Cooper,* and *Thomson* sustained the type of serious injury sustained by Williams, which is a relevant factor in determining the amount of damages to award. *See TXO Production,* 509 U.S. at 460, 113 S.Ct. 2711 (punitive damages should bear a reasonable relationship to the harm that has actually occurred). The harm in this case to Williams cannot

be overstated, nor can the egregiousness of Dr. Patel's behavior and attitude towards Williams. In light of the awards made in *Bogan, Cooper,* and *Thomson,* this Court finds that a punitive award of $100,000 is appropriate in this case. While certainly much less than that awarded by the jury, it takes into account the comparative severity of Dr. Patel's conduct and the comparative severity of Williams' injuries. The Court also believes that this award sufficiently serves the purpose of punishing Dr. Patel and deterring any such future conduct on his part. The Court has not made this decision lightly, as it firmly believes in the province of a jury to make the judgment as to what amount is appropriate. However, unlike the jury, this Court is guided by comparative cases, which do not support the $1.0 million punitive damages award.

 The Court may not arbitrarily reduce the compensatory and punitive damages awards because doing so would infringe upon Williams' Seventh Amendment right to a jury trial. *See Hetzel v. Prince William County, Va.,* 523 U.S. 208, 210, 118 S.Ct. 1210, 140 L.Ed.2d 336 (1998) (per curiam). Rather, the proper procedure is to give Williams the choice of either accepting the remittiturs or rejecting the remittiturs and forcing a new trial limited solely on the issues of compensatory and punitive damages. *See McKinnon v. City of Berwyn,* 750 F.2d 1383, 1392 (7th Cir. 1984). Williams shall inform the Court of his decision to accept or reject the remittiturs within 14 days from the entry date of this Order. Williams' choice is not limited to accepting both or rejecting both remittiturs. He may accept one and not the other, thereby necessitating a jury trial solely on the award that he rejects.

### Conclusion

For the foregoing reasons, Dr. Patel's Motion for New Trial or, in the alternative, Motion for Remittitur is GRANTED IN PART and DENIED IN PART. Within 14 days of this Order, Williams will file a

pleading with the Court in which he either accepts or rejects the remittitur of $250,000 on the compensatory damages award and the remittitur of $900,000 on the punitive damages award. If accepted, a compensatory damages award of $750,000 and a punitive damage award of $100,000 will be entered in an Amended Judgment. If either remittitur is rejected, the Court will vacate the corresponding award and a new trial will be granted regarding the rejected award.